Filed 4/30/13  In re A.V. CA1/5

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| **In re A.V., a Person Coming Under the Juvenile Court Law.** | |
| **SAN MATEO COUNTY HUMAN SERVICES AGENCY,** | **A135874** |
| **Plaintiff and Respondent,** | |
| **v.** | |
| **MARIA L.,** | **(San Mateo County Super. Ct. No. 80725)** |
| **Defendant and Appellant.** | |

Maria L. (Mother) appeals from an order terminating her parental rights as to her seven-year old daughter, A.V. (Minor).  We affirm the court's order, as we conclude the trial court reasonably found the beneficial relationship and sibling exceptions (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i) & (v))[1] do not apply, and properly considered Minor's wishes under section 366.26, former subdivision (h)(1) (see Stats. 2009, ch. 287, § 15, operative July 1, 2010).

---

[1]  All undesignated section references are to the Welfare and Institutions Code.

1

FACTUAL AND PROCEDURAL BACKGROUND[2]

*Minor's Detention*

On July 28, 2010, a San Mateo County deputy sheriff responded to a request for a welfare check on a four-year-old girl suffering from neglect and found Minor unattended in an apartment complex. The officer's investigation revealed that Minor shared a bedroom in an apartment with her 10-year old brother, J.V., and Mother; in the family's room, there was a single twin mattress with no sheets, a pile of dirty clothes on the floor, and cockroaches on the floor and in the clothing. There was very little food, and the officer was unable to determine whether it belonged to the family. Neighbors said Mother left the children unsupervised "at least three or four times a week."[3] Mother was arrested for child endangerment,[4] and Minor and J.V. were taken into protective custody. Minor had head lice; she was overweight and dirty, exhibited violent and sexualized behavior, had no sleep schedule, and had "[a]bsolutely no [social] skills whatsoever."

On July 30, 2010, the San Mateo County Human Services Agency (the Agency) filed a petition under section 300, subdivision (b), alleging Mother had a history of

---

[2]   We grant the Agency's January 10, 2013 request that the court take judicial notice of its prior unpublished writ opinion in *Maria L. v. Superior Court* (A133973, Feb. 1, 2012), but deny its contemporaneous request that the record be augmented to include its April 30, 2012 letter to this court in *In re A.V.* (A134021, Jan. 31, 2013 [nonpub. opn.]), as the Agency fails to demonstrate the relevancy of the additional evidence to this appeal, and we see none.

Mother requests that the court take judicial notice of the record and appellant's opening brief in *In re A.V.* (A134021, Jan. 31, 2013 [nonpub. opn.]), so her "opening brief may incorporate by reference the Statement of the Case and Facts in that prior appeal and obviate the need for repeating them [here]." We have a fully developed record in this appeal, with which we are familiar, and have no need to reference the record in a prior appeal. Mother's request is denied. On our own motion, however, we take judicial notice of the court's unpublished opinion in appeal No. A134021.

[3]   Minor later told a social worker in Spanish, "[T]hey leave me alone always," and J.V. "does not behave well. He looks in drawers that do not belong to him and takes money. He does not go to school and has a lot of marijuana. He hits me when he smokes marijuana. My mother knows." J.V. admitted he regularly smoked marijuana and had tried methamphetamine and alcohol. He claimed he was affiliated with a gang.

[4]   Mother's criminal case was dismissed for insufficient evidence.

2

leaving Minor alone all day without adequate food, and J.V. had daily access to drugs and alcohol.

The juvenile court ordered continued detention of Minor and J.V. in shelter care and detention of their 16-year old brother, A.V., Jr., in a placement identified by juvenile probation.[5]

*The Jurisdiction/Disposition Hearing*

The Agency's report for the jurisdiction/disposition hearing notes that "[t]he family members seem to be concerned about each other's well being. The children . . . lightened up when they see their mother during visits and vice a versa."

Under the Agency's recommended case plan, Mother was to participate in a mental health assessment, counseling, and parenting classes, and "understand what it is to be neglectful to her children and learn the necessary skills to provide them with a safe environment and ensure that all their basic needs will be met." In addition, she was to obtain a stable and suitable residence for the children.

In October 2010, the Agency filed an amended petition adding an allegation under section 300, subdivision (g) that the whereabouts of the children's father was unknown, and he had not provided the family with any financial support or made other provision for their care, housing, education, or health care.[6]

On October 7, 2010, the juvenile court sustained the allegations in the amended petition, declared the children dependents of the court, and ordered placement in a suitable foster home. The court adopted the Agency's recommended case plan and ordered visitation with Mother and between the siblings.

Minor's therapist and her Court Appointed Special Advocate (CASA) recommended that she remain with the shelter care parents pending a permanent

---

[5] A.V., Jr., had been on probation since December 28, 2009, as a result of a felony burglary of a neighbor's apartment, which he committed with J.V. He and J.V. had friends in the Sureño gang.

[6] The children's father was deported to Mexico in February 2010, after serving a prison sentence for domestic violence.

placement decision, and Minor said she wanted to "stay where she is now." Minor remained with her shelter care parents and thrived in their care.

According to the shelter care mother, Minor "really enjoys seeing her brothers and her mother, and looks forward to it"; "she is very attached to [her shelter care parents], but she is also very attached to her mom and siblings." The CASA noted that Minor "loves her brothers," and said visits with her birth family were good for her. "[Minor ] has mentioned that she likes to see her mom and brothers, but she also enjoys coming home with [her shelter care mother]."

Minor said J.V. had touched her vagina, and she continued to engage in sexualized behaviors and wet the bed. She was evaluated for sexual abuse in November 2010, but the evaluation was inconclusive.

*The Six-Month Status Review*

On March 23, 2011, the Agency filed its report for the six-month status review hearing. This report indicates that Mother had attended four therapy sessions in preparation for dyadic therapy with Minor, but had missed two sessions. Her parenting classes began on March 15, 2011, but she was ill and did not attend. During visits, Mother engaged mainly with A.V., Jr., and J.V., but was learning to engage with Minor and to recognize Minor's cues. In December 2010, Mother had a psychological evaluation by Dr. Leopoldo Villela, who concluded, " 'Without support, it is unlikely that she will be able to care for her children, exposing them to risk.' "

Sibling visits had been reduced from one hour to one-half hour because the brothers' engagement with the minor was limited, and J.V. "constantly needs to be redirected as he would rough house with [A.V., Jr.,] and the [social worker] was concerned that [Minor ] might get hit accidentally."[7] The shelter care mother said Minor would "start[] swearing again after visits with her family."

The Agency was assessing Minor's 18-year old sister as a potential placement for Minor. The CASA opposed this placement, stating "Family is important to [Minor], and

---

[7]   In late 2009, J.V. had been diagnosed with "severe Emotional Disturbance."

4

she is able to understand that she has two families. When asked which one she wants to live with, she consistently states her preference for her current caregivers." Still, Minor "enjoys meeting with her brothers and sister" and "[t]hese visits should continue," as they "are good for [her]."

On June 16, 2011, the Agency filed an addendum report, indicating that Mother and Minor had begun to work through their issues and would require "many more sessions on a consistent weekly basis over six to eight months." Mother also still needed appropriate housing and means of support. Mother had participated in parenting classes with the children, and her parenting instructor reported that she "loves her children" and "appears well intentioned." Nonetheless, her attendance and punctuality were poor, her participation in class was minimal, and she failed to complete homework assignments. The instructor said she needed to repeat the class.

In a report filed June 16, 2011, the CASA said Minor "loves living with her [shelter care] parents," was "very attached" to them, and wanted to stay in their care. On June 20, the court granted the shelter care parents de facto parent status.

In July 2011, the Agency discontinued separate visits between Minor and her brothers because of the brothers' constant rough housing, offensive language, and limited interaction with Minor.

The shelter mother reported Minor acted out after every visit with Mother and her siblings.

On September 23, 2011, the court denied a section 388 request by the sister to have Minor placed in her home, noting the potential adverse effect of a change in placement on Minor, who was clearly attached to her shelter care mother, and its concern that the sister, a 19 year old with two young children, would not be able to deal with these adverse effects. Thereafter, the sister began general education diploma classes and stopped regular visits with Minor.

On October 17, 2011, the court held a contested six-month review hearing. The report for this hearing indicates that Mother canceled two dyadic therapy sessions due to illness. Her progress had been slow, and the Agency did not recommend return of the

5

children.  The court adopted the Agency's recommendations and continued out-of-home placement.

*The 12-Month Review Hearing*

On November 17, 2011, the juvenile court held a 12-month review hearing.  The report for this hearing, filed November 4, indicates Mother had made progress in her ability to engage with Minor during visits and was now able to recognize Minor's cues.  Noting Mother had not fully utilized reunification services, the Agency recommended continuing out-of-home placement with the hope of reunification in four months.  On November 17, the Agency filed a revised report recommending the court terminate services and set a section 366.26 hearing.

The court terminated Mother's reunification services, set a section 366.26 hearing, and ordered a mental health evaluation of Minor.[8]

Dr. Robin Press conducted a psychological evaluation of Minor on December 27, 2011, to determine whether additional services were necessary to address Minor's ongoing needs, in light of the sexualized behaviors she had exhibited.  Both Minor and the shelter care mother had identified very few symptoms, so Minor's overall depression inventory was within normal limits.[9]  Minor had endorsed three items that raised serious red flags:  (1) "I am sad all the time"; (2) "Nothing is fun at all"; and (3) "I think about killing myself but I would not do it."  Dr. Press believed these symptoms may signal a serious underlying depressive disorder with suicidality and concluded Minor "is more

---

[8]   Mother filed a notice of intent to file a writ petition seeking review of the setting order and a notice of appeal from the September 23, 2011 order denying the sister's section 388 request for relative placement.  We denied Mother's writ petition on February 1, 2012. (*Maria L. v. Superior Court* (A133973 [nonpub. opn.]).)  On January 31, 2013, we affirmed the juvenile court's order denying the sister's section 388 request.  (*In re A.V.* (A134021) [nonpub. opn.].)

[9]   The shelter care mother was noted to "demonstrate[] a pronounced tendency to minimize the presence of even normal problems," which "may have resulted in a test outcome that under-represents the extent of [Minor's] psychological difficulties."  And Minor's test results indicated she "was more than [10] times more likely to screen out emotional experiences and external inputs"; "less than .01 [percent] of five year olds [show an avoidant cognitive processing style] to this extreme degree."

6

troubled than she appears on the surface." Dr. Press noted: "[Minor] seems to have made a positive shift to her foster family but is slamming the door on her family of origin with all of the attendant trauma."

On January 24, 2012, the shelter care parents requested designation as prospective adoptive parents. The CASA recommended that the shelter care placement become Minor's adoptive home, and noted Minor's disappointment when Mother failed to attend visits, which had occurred more than once.

*The Section 366.26 Hearing*

In its February 2012 report for the section 366.26 hearing, the Agency found Minor "is adoptable." She was bonded to her shelter care parents, referred to them affectionately as "mommy Teri" and "daddy," and referred to the shelter care mother's children as her sister and brother. The shelter care parents had provided Minor with stability, safety, structure, and consistency.

Minor continued to have supervised visits with Mother and J.V. Mother engaged with Minor, played games with her, and recognized her cues.

The shelter care mother said Minor was most likely to act out after visits with her birth family; she regressed in her behavior, had temper tantrums, refused to do anything asked of her, and threw things. After seeing members of her family at her birthday party in March, Minor started saying, "Fuck you," to the shelter care parents, became oppositional, and bit and pinched them. Minor's therapist said it was likely a trigger for Minor to see her birth family.

In a May 16, 2012 addendum report, the adoption social worker, Carlos Bravo, stated that Minor had become attached to her shelter care parents and sought them for support, attention, "guidance and nurture." Bravo had supervised four visits between Minor and J.V and observed, "The siblings show a genuine love and concern towards one another. For example, when [J.V.] was late to the visit, [Minor] asked . . . several times, 'Where is my brother?' After [J.V.] arrived, [Minor] was glad to see her brother and greeted him." Bravo also observed during a visit that the children were concerned for their mother, who was late; they inquired about her whereabouts, asking, " '[W]here is

my mom?' " Bravo stated that, overall, the visits were positive, and there was a bond between Minor and J.V.; they had lived together most of their lives and had frequent visitation after they were removed from the home. Bravo observed a connection between the children and said J.V. was protective of Minor. J.V. said he did not want Minor to be adopted. A.V., Jr., said Minor was "better off staying with her fost-adopt parents," but he preferred that they act as her legal guardians.

Bravo concluded: "Based on [Minor's] age, development and ability to attach to the current fost-adopt parents and family, . . . [Minor] is adoptable. Her fost-adopt parents are interested in adopting her; however, [Minor] has a relationship with her birth brother, [J.V.], as well as with her other siblings. Based on the observations of the strong connections with her siblings and family, it would be a detriment to [Minor] if the contact with her birth family is severed if and when she is adopted. The fost-adopt family has in the past maintained contact with the birth family and hopefully these contacts will continue given the severe emotional trauma that could be done to [Minor] if such contact is not maintained." Bravo said Minor appeared to have made the emotional transition to the shelter care parents and had established a sense of connectedness, security, and stability, as part of their family. Bravo recommended termination of parental rights and adoption.

The CASA strongly supported transitioning the shelter care parents' home to an adoptive home; she said she had observed Minor's increased attachment to her shelter care parents, and Minor stated on multiple occasions that she wanted to stay with them permanently.

According to the shelter care mother, Minor never asked or talked about Mother or her siblings except on the way to a visit and often did not want to attend visits, but she always seemed happy when she came out of visits.

At the hearing on May 30, 2012, Bravo testified that J.V. and Minor greeted each other warmly during visits. Bravo said Minor "has some sense of joy to see [J.V.]" Bravo said it would be detrimental to Minor to stop seeing J.V. Bravo said Minor had some connection to Mother but "[i]t's not . . . a strong connection at this point."

8

Bravo said he believed it would be detrimental to Minor to be adopted "[b]ecause I do believe that she has some connection with mom and a little stronger connection with the siblings." He clarified, however, that the "detriment" would be Minor's sadness at not seeing her birth family and stated his opinion that the secure home offered by adoption provided the stronger benefit to her. Bravo said the shelter parents had expressed their willingness to allow Minor to visit with her brothers and Mother if she was adopted.

Social worker Bertha Figueroa-Zepeda (Figueroa) testified that Mother had maintained weekly visitation with Minor, and their relationship had improved in therapy; "[t]here is a connection" between Minor and Mother, but "it's [not] a strong connection"; and Minor "recognize[s] her as her mom." Figueroa said the children initially had a separate visitation, but that was discontinued "because the boys were very rambunctious. There was a lot of profanity . . . . [The boys] . . . mainly interacted amongst [themselves] . . . and sometimes would not include [Minor]. Although [A.V., Jr.,] tried. [J.V.] wouldn't." The social worker had to intervene when J.V. "was not, at times, very nice to [Minor]." Figueroa said it would be detrimental to Minor to have her visits with Mother and her visits with her siblings "abruptly terminated."

Mother testified through an interpreter as follows: Before the children were removed, Minor and J.V. played together and were affectionate with each other. Minor "really likes seeing him" at visits, and J.V. likes to see her as well. They give each other hugs, and J.V. asks Minor about school. Minor "would get very sad" if she did not see J.V. any more. Mother acknowledged, "[T]here's sometimes that [Minor] doesn't want to greet me, but then she'll come over after and she'll give me a big hug. Minor calls Mother "mom, mommy" and likes to sit on her lap. Mother rocks Minor, and Minor gives Mother hugs and kisses.

The Agency and Minor's counsel recommended termination of parental rights and a permanent plan of adoption. Mother argued for a guardianship of Minor instead. She maintained the beneficial relationship and sibling relationship exceptions precluded termination of her parental rights.

9

On June 18, 2012, the juvenile court terminated Mother's parental rights, finding the beneficial relationship and sibling relationship exceptions did not apply, ordered adoption as the permanent plan for Minor, and granted the shelter care parents prospective adoptive parent status.

Mother filed a timely notice of appeal from the June 18, 2012 order.

DISCUSSION

I. *Applicability of Exceptions Precluding Termination of Parental Rights*

Mother contends the juvenile court erred in failing to find that the beneficial relationship and sibling relationship exceptions (§ 366.26, subd. (c)(1)(B)(i) & (v)) preclude termination of her parental rights as to Minor. We review the court's conclusion that these exceptions do not apply for an abuse of discretion. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351-1352 (*Jasmine D.*).)[10]

At a section 366.26 hearing, the court must determine a permanent plan of care for the child. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50.) The statute provides three alternatives for permanent placement: adoption, guardianship, and long-term foster care. (§ 366.26, subd. (b); *In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*).) Adoption is the permanent plan preferred by the Legislature "because it gives the child the best chance at [a full emotional] commitment from a responsible caretaker. [Citations.]" (*Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1348; accord, *In re Celine R.* (2003) 31 Cal.4th 45, 53 (*Celine R.*).) Accordingly, if the court finds that the child is likely to be adopted, it must terminate parental rights and order the child placed for adoption unless it finds, for one of six "compelling reason[s]," that termination of parental rights would be detrimental to the child. (See § 366.26, subd. (c)(1)(B)(i)-(vi).)

---

[10] Although appellate courts have routinely reviewed termination orders for substantial evidence, Division Three of this court has ruled the appropriate standard is abuse of discretion. (See *Jasmine D., supra,* 78 Cal.App.4th at p. 1351 [whether the exception applies is a "quintessentially discretionary determination"].) We will apply the abuse of discretion standard, recognizing as the court did in *Jasmine D.*, that the practical differences between the two standards are insignificant in this context. (*Ibid.*)

The burden is on the parent to show that one of these exceptions applies. (*In re C.B.* (2010) 190 Cal.App.4th 102, 122.)

A. *The Beneficial Relationship Exception*

The "beneficial relationship" exception applies when termination would be detrimental to the child because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) Assuming Mother satisfied the first prong of the exception here by maintaining regular visitation and contact with Minor, the question is whether Minor "would benefit from continuing the relationship." (See § 366.26, subd. (c)(1)(B)(i).) To establish this, Mother was required to demonstrate that the relationship "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575; accord, *In re C.B.*, *supra*, 190 Cal.App.4th at p. 124.) "[T]he court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Autumn H.*, at pp. 575-576; accord, *In re C.B.*, at p. 124.) The court makes this determination on a case-by-case basis, considering the child's age and particular needs, the time spent in the parent's custody, and whether the child's interaction with the parent produces a positive or negative effect. (*Autumn H.*, *supra*, at p. 575; accord, *In re C.B.*, at p. 124.) If the court finds the relationship with the parent does not benefit the child significantly enough to outweigh the Legislature's strong preference for adoption, the exception does not apply. (*Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1350.)

We find no abuse of discretion in the juvenile court's conclusion that Minor's relationship with Mother did not "rise[] to the level of such a beneficial relationship that we need to postpone permanency for [Minor] in terms of adoption because adoption would substantially interfere with the beneficial relationship between [Mother and

11

Minor]." "[A]re we going to really disrupt the prospects of permanency [for Minor] of a stable, loving, safe, and consistent home for the relationship that [Minor] and [M]other have? . . . I find the balance lacking there." The court found it would not be in Minor's best interests to disrupt the security and stability of an adoptive home to promote a relationship with Mother.

There is evidence Minor has a bond with Mother, was affectionate with her and turned to her for comfort, and was disappointed when Mother failed to attend visits. The exception requires more, however, than a showing that visits between the parent and child are pleasant, that the parent has maintained frequent and loving contact with the child, or that the two share an emotional bond. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 826.) The exception's applicability turns on the strength and quality of this bond. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) A parent cannot "derail an adoption merely by showing the child would derive some benefit from continuing a relationship." (*Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1348.) Indeed, "continued interaction between the biological parent and child will almost always confer some benefit on the child." (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 811; accord, *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Mother was required to show that the relationship promotes Minor's well-being to such a degree as to outweigh the well-being she would gain in a permanent home. (See *Autumn H.*, at p. 575.)

A court could reasonably find that Minor's relationship with Mother did not satisfy this standard. Bravo and Figueroa both testified that Minor did not have a strong connection to Mother.[11] The evidence also shows that the relationship was not an entirely positive one for Minor. Minor's therapist noted, " '[Minor] has expressed ambivalent feelings which shift from stating she was sad about not seeing her mother to [reacting] in a detached and rejecting way toward her mother." At times, Minor clung to

---

[11] Contrary to Mother's assertion, Bravo did not state in the Agency's May 16, 2012 report that Minor "had a 'strong connection[]' with Mother." In discussing Minor's bond with her siblings, Bravo stated: "Based on the observations of the strong connections with her siblings and family, it would be a detriment to [Minor] if the contact with her birth family is severed if and when she is adopted."

12

her shelter care parents and did not want to stay with Mother during visits; Mother acknowledged that Minor sometimes did not want to greet her. The shelter parents consistently reported that Minor acted out and regressed in her behavior after spending time with her birth family. Finally, Bravo testified that it was in Minor's best interest to have a stable home that adoption could provide, even if that impacted Minor's relationship with Mother. A court considering this evidence could reasonably conclude that the permanency of adoption outweighed any benefit Minor might gain from continuing her relationship with Mother. (See *Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1348.) Guardianship, the plan Mother advocated below, " 'is not irrevocable and thus falls short of the secure and permanent future' " intended by the Legislature. (*Celine R.*, *supra*, 31 Cal.4th at p. 53.)

Mother relies on *Autumn H.*, contending "the only reasonable inference from the evidence and the court's analysis of that evidence is that [Minor] would be greatly harmed by the loss of her significant, positive relationship with [Mother]." Mother relies on Bravo's testimony that it would be "detrimental" to Minor to be adopted and not to continue her contact with Mother. In context, however, Bravo indicated only that Minor would be sad not to continue seeing Mother and her siblings, and he confirmed that the security of an adoptive home was in Minor's best interest, even if she were no longer able to see her birth family. Moreover, the loss of a parent is traumatic for any child, regardless of whether the attachment satisfies the beneficial relationship exception. Mother must do more than show that termination would result in some detriment to Minor; she must establish "exceptional circumstances." (*Jasmine D.*, *supra*, 78 Cal.App.4th at pp. 1348-1349; *In re C.B.*, *supra*, 190 Cal.App.4th at p. 127, fn. 6, quoting *In re Brittany C.* (1999) 76 Cal.App.4th 847, 853.) She has not done so.

Mother also relies on the results of Dr. Press's psychological evaluation, arguing this evidence indicates "there was a very substantial risk that [Minor] would be beset by further 'trauma' if she was allowed by her caretakers to continue to 'slam[] the door on her family of origin.' Given that evidence, and the lack of any unique benefit which the permanency of adoption might provide to [Minor], the weight of the evidence went to

13

ensuring that neither [Minor] nor her foster parents were permitted to slam the door on [Minor's] relationship with [her birth family]." This contention also fails, for two reasons. First, Mother misconstrues Dr. Press's report, which does not indicate that Minor risked further trauma if contact with her birth family was terminated; Dr. Press simply expressed concern that Minor had "turn[ed] her back on her family of origin" instead of addressing the negative feelings associated with it. Second, in reviewing a juvenile court's decision, we do not reweigh the evidence. (*In re C.B.*, *supra*, 190 Cal.App.4th at p. 127.) It was for the juvenile court to weigh the potential detriment to Minor from losing contact with Mother against her need for permanency. The record indicates that the juvenile court balanced these competing concerns and concluded Minor's interest in a permanent stable home outweighed any detriment to her if she was not allowed to continue her relationship with Mother. Under the circumstances, the court did not act unreasonably.

Finally, Mother argues that the juvenile court "injected an improper factor into the weighing process:" the prospective adoptive parents' willingness to allow Minor continued contact with Mother. (See *In re. S.B.* (2008) 164 Cal.App.4th 289, 300 ["We do not believe a parent should be deprived of a legal relationship with his or her child on the basis of an unenforceable promise of future visitation by the child's prospective adoptive parents"]; accord, *In re C.B.*, *supra*, 190 Cal.App.4th at pp. 127-128.)[12] The record belies this assertion. Though expressing its hope that Minor's relationship with

---

[12] This principle does not apply in determining whether the sibling relationship exception precludes termination of parental rights. (*In re S.B.*, *supra*, 164 Cal.App.4th at p. 300 [noting sibling relationships enjoy legal recognition after termination of parental rights]; see *In re Megan S.* (2002) 104 Cal.App.4th 247, 252 (*Megan S.*) [indicating that, in determining whether termination will result in substantial interference with a sibling relationship, the court may consider evidence of the prospective adoptive parents' intent to continue contact with the birth family]; *id.* at p. 254 [social worker had located 25 possible adoptive homes that would allow sibling contact].) Indeed, the statute requires the juvenile court to determine whether "[t]here would be substantial interference with a child's sibling relationship." (§ 366.26, subd. (c)(1)(B)(v).)

14

Mother would continue and noting the prospect of continued contact with her, the court specifically stated, "I'm not basing my decision on that hope or that prospect."

Mother argues the court need not base its decision on the expectation that the prospective adoptive parents will continue to allow Minor to have continued contact with the birth parent; "mere consideration" of the hope or prospect of continued contact is enough to require reversal. Under *In re S.B.* and *In re C.B.*, however, the question is whether the court improperly injected this factor into its decision. We presume that the juvenile court understood and correctly applied the law (*People v. Sangani* (1994) 22 Cal.App.4th 1120, 1138; see Evid. Code, § 664); the record here does not overcome that presumption.[13]

B. *The Sibling Relationship Exception*

Mother argues the juvenile court erred in finding Minor's relationship with J.V. did not satisfy the sibling relationship exception, precluding termination of parental rights. We disagree.

"Reflecting the Legislature's preference for adoption when possible, the 'sibling relationship exception contains strong language creating a heavy burden for the party opposing adoption. It only applies when the juvenile court determines that there is a "compelling reason" for concluding that the termination of parental rights would be "detrimental" to the child due to "substantial interference" with a sibling relationship.' [Citation.]" (*Celine R.*, *supra*, 31 Cal.4th at p. 61.)[14] "[E]ven if adoption would interfere

---

[13] In light of our conclusions in this regard, we find *In re S.B.*, *supra*, 164 Cal.App.4th 289 distinguishable. (See *id.* at pp. 300-301 [reversal where, based on the record, "the only reasonable inference [was] that S.B. would be greatly harmed by the loss of her significant, positive relationship with [her father]," and the trial court based its decision in part on the adoptive parents' willingness to allow the father to continue to visit S.B].)

[14] Section 366.26, subdivision (c)(1)(B)(v) states that the court shall terminate parental rights unless: "(B) The court finds a compelling reason for determining that termination would be detrimental to the child [because] . . . (v) There would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or

15

with a strong sibling relationship, the court must nevertheless weigh the benefit to the child of continuing the sibling relationship against the benefit the child would receive by gaining a permanent home through adoption. [Citation.]" (*Ibid.*)

The juvenile court found that, even though Minor and J.V. enjoyed each other and loved each other, their relationship was not "that close" and was not so substantial that "disrupting [it] for a permanent plan of adoption would be so detrimental to [Minor] that [adoption] would not be in her best interest." The court said Minor "loves her brother, but I don't think that not seeing him a week or so, or not seeing him regularly, . . . in and of itself is going to set her back and cause her such a regression that it would be better for her to exist in the non-permanent situation — either [guardianship] or long-term foster care versus the permanency that the adoption plan does provide for her."

The evidence in the record reasonably supports a finding that adoption would not substantially interfere with Minor's relationship with J.V., specifically, the shelter care parents' expressed intent to continue contact with J.V.

In any event, the evidence reasonably supports the juvenile court's conclusion that the permanency provided by adoption outweighed the benefit of Minor's relationship with J.V. Bravo testified that Minor would receive a stronger benefit from a stable home than from maintaining a relationship with her siblings, even though the loss of those relationships would make her sad. Indeed, it borders on the absurd to suggest that the evidence establishes as *a matter of law* that the benefit Minor received from her relationship with J.V. justified depriving her of a permanent placement indefinitely. Minor spent the first four years of her life with him in the same circumstances of neglect and had regular visits with him after removal; she loved J.V. and was affectionate with him; and Bravo said she had a "sense of joy" to see him during visits. Figueroa indicated, however, that Minor's interaction with J.V. was sometimes positive, but at times it was not. The social worker often had to intervene because J.V. was not nice to

has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption."

16

Minor. Figueroa once canceled a visit, stating that J.V. did not like visiting with Minor when Mother was not present, and Minor said she was bored during visits with J.V. alone. Minor also said she did not play with J.V. very much during visits; during one visit, he played with the social worker's phone the entire time while she played with Mother. Indeed, separate visits between the siblings were discontinued because J.V. and A.V., Jr., had little interaction with Minor. There also was evidence that Minor never asked or talked about her siblings except on the way to a visit and often did not want to attend visits.

Mother argues, "the evidence here strongly indicated that [Minor] would suffer substantial harm if her relationship with [J.V.] were terminated," relying on Bravo's testimony it would detrimental to [Minor] to stop seeing J.V. and his report that Minor could experience "severe emotional trauma" if contact with her birth family was discontinued. Mother fails to recognize, however, that a court may terminate parental rights even if it finds separation from a sibling would cause a child to suffer detriment, if it also determines the child "would benefit more from adoption than she would gain by maintaining a relationship with [her sibling]." (*Megan S.*, *supra*, 104 Cal.App.4th at p. 252.) The court reasonably made such a finding here.[15]

Mother also relies on Dr. Press's report, contending "the weight of this evidence alone pointed strongly to the fact that it was in [Minor's] best interest that the court ensure that neither [Minor] nor her foster parents were provided with the opportunity to slam the door on [Minor's] relationship with [her birth family]." We reject these arguments for the reasons discussed above in addressing the impact of this report on the beneficial relationship exception. (See, *ante*, part I.A.)

---

[15] Citing *In re Valerie A.* (2007) 152 Cal.App.4th 987, Mother also argues the court should take into account the future emotional benefits to the child from maintaining sibling contact throughout his or her life She has forfeited this argument by failing to raise it below. (*In re Anthony P.* (1995) 39 Cal.App. 4th 635, 641 [appellant may not assert error on appeal when she failed to raise the issue in the trial court]; accord, *In re Amanda D.* (1997) 55 Cal.App.4th 813, 819-820.)

## II. *The Child's Wishes*

Finally, Mother maintains "reversal is required here because . . . the juvenile court was not fully aware of [Minor's] desires with regard to termination of parental rights and adoption." "At all proceedings under this section, the court shall consider the wishes of the child and shall act in the best interests of the child." (§ 366.26, former subd. (h)(1).) Here, the juvenile court noted that reasonable inferences from the evidence indicated Minor wished to be adopted by her shelter care parents.

Mother has not shown a lack of substantial evidence to support this finding; she argues, rather, that there must be direct evidence Minor was aware that the proceeding involved the termination of Mother's parental rights. In *In re Diana G.* (1992) 10 Cal.App.4th 1468, Division Three of this court construed an identical provision "to require the juvenile court to receive direct evidence of the children's wishes regarding termination and adoption at the permanency planning hearing. This evidence may take the form of direct formal testimony in court; informal direct communication with the court in chambers, on or off the record; reports prepared for the hearing; letters; telephone calls to the court; or electronic recordings. Although a child's presence in court is not required, an out-of-court statement, as in a report or other form, must reflect the fact that the child is aware that the proceeding involves the termination of parental rights." (*Id.* at p. 1480.)

Other courts have disagreed. In *In re Leo M.* (1993) 19 Cal.App.4th 1583, the Fifth District stated: "While we are both statutorily mandated and morally constrained to act in the best interests of the child, to the extent possible children should have some voice. It is, after all, their futures we decide, their destinies we begin and their entire lives we affect. But in honoring their human dignity we must be mindful that we should not carelessly impose upon them decisions which are heavy burdens even for those given the ultimate responsibility to decide. To ask children with whom they prefer to live or to ascertain what they wish through other evidence is one thing. To ask those children to choose whether they ever see their natural parent again or to give voice to approving that termination is a significantly different prospect. We must have regard for the possible

and readily conceivable anguish that such confrontational choices could create in a short lifetime already filled with trauma.  We see nothing to be gained by mandating such a specific requirement and we see no statutory language compelling that it be inferred.  Therefore, we conclude that in considering the child's expression of preferences, it is not required that the child specifically understand the proceeding is in the nature of a termination of parental rights." (*Id.* at p. 1593; accord, *In re Amanda D.*, *supra*, 55 Cal.App.4th at p. 820 [Fourth District stating it is "just plain wrong" to assert that court must specifically ask how the child feels about ending the parental relationship].)  We need not decide this question.

There is direct evidence of Minor's wishes regarding adoption, and the record shows Minor is "aware that the proceeding involves the termination of . . . parental rights."  Although the social workers had not spoken with Minor about adoption or termination of parental rights, the shelter care parents stated that at some point after parental rights were terminated in November 2011, they "introduced the topic with [Minor] with picture books about the subject," including a book entitled, "Families Change:  A Book for Children Experiencing Termination of Parental Rights."  Minor stated consistently throughout the proceedings her desire to remain with her shelter care parents; and the CASA indicated shortly before the section 366.26 hearing that Minor had said multiple times she wanted to live with her shelter care parents permanently.  A court could reasonably conclude from this evidence that Minor desired adoption by her shelter care parents.[16]

### DISPOSITION

The juvenile court's June 18, 2012 order is affirmed.

---

[16]  To the extent Mother contends reversal is required because Minor's counsel did not comply with section 317, subdivision (e)(2) by failing to "interview the child to determine the child's wishes" and "advise the court of the child's wishes," and the juvenile court failed to comply with sections 366.22, subdivision (c)(1)(E) and 366.21, subdivision (i)(1)(E), she has forfeited the error alleged by failing to raise it below. (*Amanda D.*, *supra*, 55 Cal.App.4th at pp. 819-820.)

_____
SIMONS, J.

We concur.

_____
JONES, P.J.

_____
BRUINIERS, J.